GEORGE B. CHASE, Respondent, v. THOMAS LORD and DAVID N. LORD, as Executors, etc., of RUFUS L. LORD, Deceased, Appellants.

*Chapter 308 of 1849 — insurance company organized under — cannot carry on business until the capital stock is paid in full — Liability of stockholder for debts — survives against his estate.*

Under chapter 308 of 1849, authorizing the formation of insurance companies, no company is authorized to commence to carry on business until the whole amount of its capital stock, as stated in its articles of association, has been paid in. It is not sufficient to authorize it to carry on business that $150,000 have been paid in, if its capital stock named in its charter exceeds that amount.

When a company commences to carry on business before its capital stock is paid up in full, each of the stockholders is jointly and severally liable for all debts contracted by it.

The liability of a stockholder for such debts survives his death, and may be enforced against his estate.

Appeal from a judgment in favor of the plaintiff, entered upon the verdict of a jury, and from an order denying a motion for a new trial, made upon the minutes of the justice before whom the action was tried.

The action was brought to enforce the payment by one of the stockholders, individually, of a claim against the Columbian Insurance Company.

*D. D. Lord*, for the appellants.

*Wm. C. Whitney*, for the respondent.

Daniels, J.:

The Columbian Insurance Company, which was a corporation formed for the purpose of carrying on the business of marine insurance under the authority of chapter 308 of the Laws of 1849, on the 1st of February, 1865, issued a policy of insurance to the plaintiff in the sum of $50,000 on the ship Eagle Wing and her freight. During the continuance of this policy she became a total loss, and notice of such loss was given to the company about the 11th of October, 1865. The company became insolvent early in the year 1866, and its affairs passed into the hands of, and were closed up by receivers appointed by this court. The assets proved insufficient to pay any considerable portion of the debts of the company, and this action was prosecuted against the defendants to recover the amount due and owing under the policy on account of this loss. The testator was one of the associates in the organization of the corporation, and also a stockholder while it continued in the transaction of its business. The company was formed in the year 1857. Its capital, by the charter adopted, was declared to be the sum of $500,000, divided into 5,000 shares of $100 each, with liberty to increase it, by issuing additional shares of stock, to an amount not exceeding $1,000,000. This was still further increased by chapter 127 of the Laws of 1864, which provided that the capital of the company should consist of $1,000,000, with liberty to increase it from time to time to the sum of $5,000,000, and under this authority, by resolutions of the board of directors, the capital was afterwards advanced, first to the sum of

$2,500,000, and next to the sum of $3,500,000. The testator subscribed to each issue of stock in the advancement of the capital of the company, and paid in full all his several subscriptions, and all the stock which the company proposed to issue was subscribed for, and all the subscriptions under the last issue of stock provided for in advancing the capital of the company were paid, except those of three persons, who subscribed for 597 shares of the par value of $59,700 which was never paid. The last advance was made in the amount of the capital on the 30th of January, 1865, and on the first of the following month the policy in suit was issued.

Before the company commenced doing business, it received in cash subscriptions the sum of $152,000 ; and the certificate of three persons, appointed by the Comptroller to make an examination of the facts, was made upon oath, stating that $150,000 in cash had been paid in, and was then possessed by and was a part of the capital of the company. No other certificate was at any time made showing the payment of any portion of its capital; and this was held at the trial to be insufficient to constitute a compliance with what the statute had required for the legal organization of marine insurance companies. For that reason it was further held that the testator, as a corporator and stockholder in the company, had become personally liable for the loss sustained by the plaintiff under the policy, and a verdict was accordingly directed against the defendants, who were his executors. Whether these rulings were correct is consequently the controlling point, required to be decided in the disposition of these appeals.

In order to form a company under chapter 308 of the Laws of 1849, it was necessary that not less than thirteen persons should associate and file in the office of the Secretary of State a declaration, signed by them, expressing their intention to form such company. That was required to comprise a copy of the charter proposed to be adopted by them ; and notice of their intention was then required to be published for at least six weeks in a public newspaper in the county in which it was proposed to locate the company. (Laws of 1849, chap. 308, pp. 441, 442, §§ 1, 3.) After doing that the associates were empowered to open books for subscriptions to the capital stock of the company, and to keep them open

until the full amount specified in the charter was subscribed; or, in case the business was proposed to be conducted on the plan of mutual insurance until propositions and agreements for insurance were entered into with at least 100 applicants, the premiums on which should be $300,000, to entitle the company to do business in the city of New York, where this company was located. (Laws of 1849, §§ 4, 5.) The associates provided in their charter that the company to be formed by them might, from time to time, receive notes for premiums in advance of persons intending to receive its policies, after $200,000 of its capital stock should be subscribed for and actually paid. But it did not appear that anything had been done under that authority. The case proceeded on the theory that the company became incorporated, and afterward transacted business as a stock company; and in that view alone it will be material to consider it. As such it could not do business on a smaller capital than the sum of $150,000. (Laws of 1849, § 5.) But the amount to which that might be extended was no otherwise restrained, than by the requirement that whatever it might be it should be stated in the charter. (Laws of 1849, § 9, subd. 4.) And it was not provided that the business of the company could be commenced before the whole amount of its capital should be paid in. What was in terms provided was simply in the nature of a restraint, and that was that no company should be organized in the city and county of New York on any smaller amount of capital than $150,000. There was nothing in this section of the act authorizing any company organized under it to do business before all its capital, whatever that might be, was subscribed for and paid. It merely prohibited the organization of companies with less than the prescribed fund; while the preceding section, declaring that the books might be kept open before the organization should be completed until the full amount of capital specified in the charter was subscribed, contemplated that the object so provided for would, in fact, be accomplished. It was the capital on which the company was to be organized that the act provided for and proposed to regulate; and if the company was not possessed of that capital it was not lawful for it to do business. (Laws of 1849, chap. 308, § 7.)

A construction that would not permit a company organized

on a capital of $150,000 to do business until it had all been paid in, and would, at the same time, allow another, whose capital might be millions, to proceed with its business after it had secured the same amount, would be entirely unreasonable, and it should have plain terms to warrant it before it could be properly adopted. There is nothing in this portion of the act which would warrant the conclusion that this was all that was intended to be required. If it had been, then the capital of the company, required to be stated in the charter, would form no criterion whatever of its safety or business competency; but it might be made the artifice and device of deception and fraud, entailing loss beyond computation upon those who, in their business, could be induced to measure the ability of the company by the statement of what its capital might be, instead of what it actually was.

This was not the policy nor the terms of the law; but its provisions, though obscurely expressed, were evidently intended to require that the company should become fully possessed of all the capital which its charter was to state as that which was to be employed by it in the business. This intent was quite clearly made manifest by the section providing for the annual report and publication of the state of its affairs, and the attendant declaration that if, upon due examination of them, it should appear that the losses and expenses had exceeded the premiums received, in consequence of which the capital had become deficient to the extent of twenty-five per cent, that then the officers of the company should be directed to wind up its business unless, within sixty days, the stockholders should pay the amount of the deficiency. (Laws of 1849, chap. 308, § 13.) For it discloses the existence of the expectation, that any company engaged in the business of insurance would be possessed of the entire amount of its capital, and the intention, when that was not the truth, to terminate its capacity for continuing the transaction of its affairs as soon as that had become impaired to the extent of twenty-five per cent. There could be no other useful end accomplished, by requiring any specific amount of capital to be mentioned in the charter. Any different policy would be, in substance and effect, to provide that insurance companies might state in their charters any fabulous amount which the associates might fancy as their capital, and then

be allowed to engage in and carry on their business on the acquisition of merely $150,000, and that would be entirely inconsistent with these last provisions, under which every company must be dissolved as soon as the nominal capital has become deficient to the extent of twenty-five per cent, unless the deficiency be supplied within the period of sixty days. What for these purposes has been considered as the capital is the amount alone at which it may have been stated in the charter.

It has been strenuously urged that other provisions have been made by the act which are inconsistent with this conclusion. They will be found in the eleventh section of the act. By them it has been enacted that the charter placed on file should be examined by the Attorney-General, and if found to be in accordance with what has been required by the act, and not inconsistent with the Constitution of the State, he should then certify it to the Comptroller, who should cause an examination to be made, either by himself or by three disinterested persons appointed by him, " who shall certify on oath that an amount equal at least to the amount specified in the fifth section of this act, if it be a stock company, has been paid in and is possessed by it in money, or in such stocks and bonds and mortgages as are required by the eighth section of this act." Copies of such certificates have been further required to be filed in the office of the Secretary of State, whose duty it has then been made to furnish the corporation with a certified copy of the charter and these certificates, which, upon being filed in the office of the clerk of the county in which the company has been located, constitute its authority to commence business and issue policies. (Laws of 1849, chap. 308, § 11.) But there is nothing in these provisions authorizing the acceptance, as the business capital, of anything less than the full amount of the nominal capital mentioned in the charter. It was not in terms, nor by implication, declared that the certificate might be made on the basis of $150,000 for a company whose capital was fixed at $500,000. But as no company in the city of New York could be organized on a smaller capital than $150,000, the certificate could in no case be made where that sum had not been paid in and was possessed by the company. This section and the one particularly mentioned in it must be construed together. The one provides for what shall

be the smallest corporate capital allowed, leaving the associates to exceed that, as they may consider expedient, and the other for an examination to ascertain whether the capital to be raised has actually been secured; not whether a company with the largest amount of nominal capital has obtained the very smallest amount of actual capital on which the business of insurance by any company can possibly be transacted, but whether it has the capital in fact which, by its charter, has been stated to be the amount that should be employed, as the statute has stated it, in the transaction of its business. If the provisions made should not be so applied and construed, then there would be no possible object in limiting the capital of an insurance company in its charter by any particular statement of the amount. For any company could begin and carry on its business indefinitely, after it secured the actual capital of $150,000, without adding to it a single cent for the purpose of making up the difference between that and the sum named in the charter as the actual capital. This would be plainly inconsistent with the requirements made by the succeeding section thirteen of the act, which contemplates that the capital shall be maintained at the amount mentioned in the charter, and by no contingency be allowed to fall below seventy-five per cent. of that amount. What capital it was intended the company must have, has been there clearly shown. For what has been referred to as " the capital of such company " has also been mentioned as its capital fixed by the charter of the company. The phrases were used as the equivalent of each other, and they were framed in such a manner as to exclude all possibility of mistake on this subject. To conform to them nothing less than the full amount of the nominal capital will do for the actual capital of the company.

If this was not the intent and purpose of the act then it has prescribed no means, after the certificate has been made, for advancing the capital from the smaller amount to that prescribed in the charter of the company. By section four provision has been made for that, before the organization has been completed, by the investigation required under the authority of the Comptroller. But no provision has been made of that, or of any similar nature, after that investigation. And the fact that the associates, before they became a corporation, were empowered to open the books

for stock subscriptions, and to keep them open until all the stock had been taken, indicates that it was designed that this should be fully accomplished before the Comptroller could regularly examine into the state of the actual capital of the company. The subsequent section nineteen of this act can be made consistent with no other or different construction of these provisions; for that has provided in plain terms that "the trustees and corporators of any company organized under this act, and those entitled to a participation of the profits, shall be jointly and severally liable until the whole amount of the capital raised by the company shall have been paid in, and a certificate thereof recorded as hereinbefore provided." (Laws of 1849, chap. 308, § 19, p. 448.) The only certificate provided for upon this subject is the one already considered, which was to be made and filed under the authority of the Comptroller; and this section, in terms, requires it to show that the whole amount of capital raised, that is mentioned or provided for in the charter, has been paid in. If this could be satisfied by the smallest amount upon which any company could be permitted to be organized, it would be absurd to provide for this joint and several liability of the corporators, trustees, and persons entitled to a participation of the profits. If the liability was intended to end when the $150,000 was obtained it never could exist at all. For no company can regularly become a corporation, or transact any corporate business, or enter into any obligations on which the liability could possibly arise, until after the $150,000 has been obtained. Such a construction would limit this joint and several liability by a restriction within which it never could exist. It would make the act provide that the corporators, trustees, and participants in the profits should be jointly and severally liable for something that could not be done at all; for before the certificate has been made and filed no corporation can be brought into existence, and no power to transact business has before that been conferred upon the associates, beyond that of signing and filing their declaration, with a copy of their proposed charter, publishing notice thereof, and opening books and receiving subscriptions to the stock of the proposed corporation; and in all of it there can be nothing to which this joint and several liability can be practically attached; so that with the adoption

of such a restraint upon it this legislation would be useless and frivolous.

What was obviously intended by this provision was the creation and continuation of this joint and several liability, until all the capital which, by the terms of the charter was to be raised, was actually obtained. Persons dealing with the associates, and those acting under or succeeding them, were assured of the existence, either of this personal liability or the benefit of the entire fund provided by the charter as the capital, and until the certificate filed showed that this provision of the charter had been complied with. The amount to be both obtained and certified was what the associates, by the charter, declared should be raised as the capital. Both were required to terminate this personal liability of the parties mentioned in the statute. The whole amount of capital was to be paid in, and a certificate thereof — that is, that it had been so paid — was to be obtained as before provided. This is the clear import of the provision, and it renders it apparent that the certificate to be made should show that the full amount of the capital had been obtained, and not merely the smallest sum mentioned in the fifth section, when that was less than the nominal capital of the company. This certificate was designed to be the legal evidence that the company had complied with what the statute had required in order to exempt its corporators, trustees, and stockholders from personal liability; and no such certificate was ever obtained or filed in the course of the organization of this corporation. It has not been contended that chapter 127 of the Laws of 1864, by which the article of the charter declaring what its capital should be, was so amended as to make it $1,000,000, with power to extend it to $5,000,000, in any way relieved it from the obligation to conform to whatever had been required of it by the act under which its organization was secured; and as that did no more than simply increase the amount of its capital no such position could very well be sustained. For it simply worked such a change in the charter as to make it state the amount of the capital, and the power of increasing it, as that was expressed by the act, instead of what had been originally declared by the associates. In all other respects the company was left to the observance of the obligations prescribed by the general law of the State.

Before this general law was enacted insurance companies were organized by special charters obtained from the Legislature, and an examination of the charters, provided from time to time in that manner, discloses it to have been the legislative policy of the State to require the capital of the company to be actually provided, or else that the individual liability of the persons themselves should be maintained. Parties dealing with such companies were to have one or the other; and as that was necessary for the security of the public there can be no good reason for supposing that any design existed to change it in providing, as the Constitution of 1846 did, that these charters should afterward be derived under general laws instead of special legislation. The policy of the Constitution was the other way; and to carry it out, it was declared that " dues from corporations shall be secured by such individual liability of the corporators, and other means, as may be prescribed by law." (Const., art. 8, § 2.) And so was that of the general law afterward passed, unless it must be so construed as really to defeat the existence of this personal liability altogether, by limiting it to a period during which no obligations can be assumed by the company to which it can be attached. That was plainly not the intention of the Legislature; but while it has been inartificially expressed, the intention has still been manifested that this individual liability shall remain until the entire capital of the company has been acquired, and a certificate to that effect has been made and filed; and that should certainly be maintained. It was the whole amount of the capital raised by the company that was to be paid, and certified as having been paid in, which was to have the effect of terminating the individual liability; and as that was not done in this case the testator, as a corporator and a person entitled to a participation in the profits of the company, remained liable for its debts when the loss accrued under the policy issued to the plaintiff. The capital was not all paid in, and no certificate has been made that it was paid in. The certificate, on the contrary, was that only $150,000 had been paid in, and that, as it was certified, only " being part of the capital of said company." As that was the only certificate made, and it was not the one required by the law for the purpose of terminating the personal liability of the corporators, trustees, and stockholders, who could be the only

participants in the profits, that still continued in favor of all persons dealing with the company and receiving its policies. The case undoubtedly presents a legal hardship so far as it affects this estate, for the reason that the testator made no default in payment upon his part. But as the liability has been provided by the statute, and cannot on account of its severity be changed, it must be sustained. A discovery of the facts creating it was fully and conveniently within the reach of all persons dealing in or owning the stock of the company; for it required nothing further than a knowledge of the amount of capital fixed by the charter, and a perusal of the contents of the certificate, both of which were on file in the office of the clerk of the county in which the company itself was located; and as the testator was a corporator and a stockholder these facts must have been known to and understood by him. That he failed to appreciate their legal significance cannot be allowed to relieve his estate from the consequences of his mistake.

The right of action was neither a penalty nor a forfeiture, but a liability created by statute for the debts of the corporation in which he was a member; and an action may be brought upon it at any time within six years after the accruing of the cause of it. (Code of Procedure, § 91, subd. 2.) And where the party liable has departed this life an additional period of one year has, on that account, been added to the time (Code, § 102); where, as was the fact in this case, the cause of action was such as the law had provided should survive. For the effect of the statute creating the liability was to render the testator a contracting party, and as such liable for the performance of the obligation entered into by the company, and within the time so prescribed this action was commenced.

The case was properly disposed of at the trial, and the judgment and order should be affirmed.

Present — INGALLS, P. J., DANIELS and POTTER, JJ.

Judgment affirmed.